37 N.J. Super. 569 (1955)
118 A.2d 83
VIOLET W. DAVIS, BY HER GUARDIAN AD LITEM, ROBERT J. DAVIS, AND ROBERT J. DAVIS, INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
MARTIN HELLWIG, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 24, 1955.
Decided November 7, 1955.
*570 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. John J. Manley argued the cause for appellants (Mr. Gerald A. Caruso, attorney).
Mr. Thomas M. Kane argued the cause for respondent (Mr. Vincent P. Torppey, attorney).
The opinion of the court was delivered by JAYNE, J.A.D.
The trial of this action was concluded by a jury verdict in favor of the defendant of no cause of action. The application of the plaintiffs for the allowance of a new trial was denied by the trial judge. The present appeal transports the consequential final judgment to us for appellate review.
Primarily we observe from our examination of the transcription of the testimony introduced at the trial that unlike the characteristics commonly noticeable in negligence cases, here the factual circumstances are not in a state of substantial dispute.
Thus, the determination of the credibility of the testimony of the witnesses in those particulars was not as is usual in such cases a nethermost controversial problem, if any, for the respected determination of the jury. This is a distinguishable feature of the case which we pause at the outset to accentuate. *571 Therefore the question confronting us in the present appeal, as we view it, is whether in the light of the established facts and the applicable principles of law the verdict of the jury is manifestly a perversion or deprivation of justice.
In its present state this case represents a rare exemplification of what a jury evidently for some irrational reason regarded as the exercise of reasonable care in the commission of a legally unjustifiable and injurious reckless act.
Now the indubitable facts. The defendant has been a member of the police department of the City of Newark for the past 12 years. On the morning of June 11, 1953 his particular assignment was to patrol and to prevent vehicular congestion on West Park Street. In the pursuit of his duty he observed at about 11:45 A.M. an unoccupied motor vehicle parked on West Park Street in front of the entrance to the self-service liquor department of Klein's store. He entered the store to ascertain and direct the owner of the vehicle to remove it, and coincident with his entrance the department manager was discovered detaining an unidentified man who was endeavoring to steal some bottles of liquor. The manager, Mr. Levine, at once imparted this information to the defendant.
Let us listen to the defendant's explanation:
"Q. What happened from there on? A. I walked over to the colored man. He had a shopping bag in his hand. Mr. Levine had him by the arm. As I approached him I was on the side of him. He give me a shove and he knocked me aside and he ran. As he ran, he was going to the door. A woman was coming in the door, and he halted her with his hands and he knocked her down and her head struck the floor. She lay there and he jumped over her and I went around the side of her. Then when he got outside by the sidewalk somebody tripped him. He went down on his hands and he went a couple of times like this. He went half-way out in the street. He got here, then he made a sudden swerve and he went toward West Park Street.

* * * * * * * *
Q. Now he's running along West Park Street. What did you do? A. I hollered 4 times `Halt' and he kept on running.
Q. Then what did you do in reference to your revolver? A. I aimed the gun at his leg, real low, for the calf of his leg or his heel, to hit his heel or leg, to see if I could stop him.

*572 * * * * * * * *
A. * * * He headed toward Halsey Street. I'm about  well, I don't know exactly  2 or 3 steps off the curb. He was running so fast he couldn't turn. He had to go way out in the street before he could turn. Then he turned toward Halsey Street. I got off the curb. I hollered 4 or 5 times `Stop.' He didn't stop. I shot for his leg."
Another positive circumstance is that the infant plaintiff was at that time walking in a westerly direction in company with her aunt on the northerly sidewalk of West Park Street in the direction toward which the shot was fired. The inference is irresistible that their presence on the sidewalk of the street was within the circumference of the defendant's outlook. It is deducible from the evidence that in his haste he ignored the presence of pedestrians on the street. The thief completely escaped presumably unwounded, but the bullet so discharged from the defendant's revolver entered the lateral aspect of the infant plaintiff's left thigh and emerged from the posterior and lateral aspect of her right thigh. The course of the passage of the missile was through both labia minora, which are part of the external genitalia of the female.
The bullet was found and thereafter examined by a ballistics expert of the police department, who expressed the opinion that it had been fired from the defendant's revolver and had richocheted from some "semi-hard substance" before striking the infant plaintiff. The fact that the point of the exit of the bullet from the plaintiff's body was more elevated than the point of entrance carried some additional significance to the inference that the bullet did in fact richochet.
Supplemental information of note is that the merchandise sought to be stolen by the thief was of the value of $36.87. The only divergency in the testimony relates to the estimated number of persons on West Park Street in the vicinity of the mishap at the time of its occurrence. The uncertain and indefinite calculations range from the presence of 20 to 30 persons to a "few."
*573 A consideration of fundamental moment is that it is not apparent from the existing factual circumstances and the relevant state of the law that the defendant was in any wise lawfully justified in his deliberate intention to shoot at and disable the fleeing misdemeanant. Noback v. Town of Montclair, 33 N.J. Super. 420, 427 (Law Div. 1954), and authorities therein cited. The layman is told that if the defendant had with skillful accuracy shot and wounded the fleeing petty thief as intended, he would as a matter of law have committed an unlawful tortious act for the injurious consequences of which he is responsible. Here, the defendant's marksmanship was faulty, he shot an innocent pedestrian instead, and the jury exonerated him from consequential civil liability. The anomaly thus occasioned by the judgment rendered in this present case is conspicuous. In our review of the postulated factual circumstances, we are obliged by the existing state of the decisional law to recognize that the defendant committed an unjustifiable, illegal, and wrongful act in discharging his gun at the fugitive petty thief.
Those trained in the law will appreciate that the elements of a cause of action for assault and battery embracing an intent to injure and those of a cause of action for negligence are distinguishable, and observe that in the present case the allegations of the plaintiffs charged the defendant with a wrongful act offending his legal obligation to exercise reasonable care. Vide, 6 Ohio State Law J. 100. We know, too, that reasonable care is variable in degree. The degree of care to be deemed reasonable is that which is commensurate with the natural and probable risks and dangers attending the particular undertaking.
Courts have universally regarded loaded firearms as dangerous instruments and have ascribed an elevated degree of reasonable care and caution to be exercised in their use. Moebus v. Becker, 46 N.J.L. 41, 44 (Sup. Ct. 1884). Those were considerations of supreme essentiality of which the jury should have been aware in measuring the requisite caution to have been employed by the defendant.
*574 Here the uncontroverted testimony also discloses that the suspected thief had to the knowledge of the defendant abandoned his loot in the store. Nevertheless the defendant discharged his weapon at him in a somewhat horizontal direction along West Park Street at 11:45 in the forenoon.
We are unable to comprehend by what process of logical rationalism addressed to the established circumstances of the case the jurors could conclude in the absence of mistake, sympathy, prejudice or partiality that the defendant was not remiss in the observance of his precautious duty to exercise a degree of care commensurate with the reasonably foreseeable likelihood of endangering the safety of some pedestrian such as the infant plaintiff.
We are of the opinion that the verdict was attributable to one or more of such improper influences and that the resultant judgment clearly, yes, unequivocally appears to exhibit a manifest denial of justice under the present state of the law and the undisputed facts. Hartpence v. Grouleff, 15 N.J. 545 (1954).
Reversed and a new trial directed.